The opinion of the Court was delivered by
Duncan J.
On this motion for a new trial, various rea *528 sons for a new trial were assigned by the counsel of the defendants, but they ultimately rested on two -points of law reserved. It is therefore unnecessary to encumber the case with a detailed statement of the title, and the many facts and circumstances -given in evidence. These points are abstract principles of law, of general importance; the first one of some novelty ; the latter, although of more general importance, not altogether new to us. I will proceed to consider them without further prefatory observations.
The first is, did the plaintiff shew such title, either in law or equity, as that she could sustain ejectment.
The second, respects the admission of certain Irish statutes in evidence.
1. She claimed title under the devise in the will of Isaac Hozey. In this State, where there is no court of chancery, the recognition and adjustment of all that branch of equitable title, which is exclusively of chancery jurisdiction, has been from the earliest period of our judicial system exercised by the only courts we have, common law courts, and equity has been administered by these courts by the medium of a jury. Hence has arisen a species of action of ejectment denominated equitable ejectment. One universal rule which pervades this equitable action is, that a party having a beneficial interest in lands, or arising out of lands, may have recourse for remedy to this action, where he has no other remedy by action at common law, and where chancery would grant relief; and this is now considered as part of our common law. Relief is granted on equitable terms, and the verdicts of juries, and judgments of Courts are so moulded, as to conform, as far as possible, to decrees in chancery. If this power were not exercised, there would be a lamentable failure, of justice ; but it is not liable to the reproach which has been imputed to it, of the exercise of an arbitrary discretion in every particular case, ex re nata. It is governed by certain rules, applied to the circumstances of each case, by which Courts and juries are as much bound, as they are by positive institutions, or the principles of the common law. These, rules are not vague and undefined, and are not left to be dedided by juries according to the opinion of the equity of every case, and of the extent of relief; but the facts on which the supposed equity arises being submitted to the jury, as all facts must be, it is the province of the Court to de *529 eide whether the facts being established to the satisfaction of the jury, the party is entitled to relief, and to direct the mode and extent of relief.
If justice were not thus administered, it would cease to be administered by law, which is general; it would be different in every county; different in every term; different in each cause : it would, instead of being a certain rule, be jus vagum et incognitum: such it is not. But it has its imperfections, beyond the controul of the Court. The greatest is, the want of power in the Court to bring in all the proper parties.
Three of the persons nominated executors, viz., Joseph Snyder, David Ware, and Charles Penrose, refused to act as executors, or accept of the devise under the will. Letters testamentary issued to Margaret Jones the plaintiff, alone. Formal renunciation in writing was not made, until after the . bringing this action. David Ware is dead. Charles Pen-rose, and Joseph Snyder, were examined as witnesses ; declared that they from the first rejected the devise, and the executorship ; and that they would not suffer their names to be used as parties on the record ; thus continuing the disagreement to the devise, and disclaiming in Court. The distinction between devises of naked authority, and of authority coupled with an interest, is subtle and refined; but this is clearly of the latter kind. It is a devise of the estate to be rented, until the younger son of the testator arrives at the age of sixteen. The estate is devised to them, to the intent and purpose, that they shall rent the same until that time, and divide the rents as the will directs. For if one devises land to be sold by his executors, an interest will pass. Co. Lit. 113. In such case, although the executors renounce the executorship, they may still sell the land. Swinb. 387. Rud. of Law and Equity, 311, and that although the proper names are not mentioned. 8 Vin. 466. And although the power of sale is extinguished at law, by their continued refusal, yet a court of equity would compel its execution in favour of those for whose benefit the powers were given. Co. Lit. 113. But here, all have not refused. One, the plaintiff, has agreed to the devise ; and the question is, what operation had the disagreement of the others on her legal estate. The estate was devised to the four as joint-tenants. There are three different interests in land. First, the estate, in the land itself, *530 the ancient common law fee. Secondly, the use, which was originally a creature of equity, but since the statute of .uses, it draws the estate in the land to it, so that they are joined, and make one legal estate. Thirdly, the trust, which the common law takes no notice of, but which conveys the beneficial interest and profits in chancery, and is still a creature of equity, as the use was, before the statute. Willet v. Sandford, 1 Ves. 186. By this will, the estate in the land, and the use, are devised to the four trustees, until Thomas TIozey arrives at 16; for a devise of land, by force of the statute enabling to devise, carries the estate in the land and the use without saying to the use of the devisee; but the true and beneficial interest, is to the widow and children of the testator. We are then to consider this as the legal estate, in a court of law, and the possessory right of the plaintiff, without relation to the trust; and at law, he in whom the legal estate is, can alone sustain an ejectment; that alone is looked to, more particularly, where, from the nature of the trust, possession and the formal title are to go together. Devise to two joint-tenants, one of them dies in the life time of the testator, the survivor takes the whole. Barker v. Giles, 2 P. Wms. 280. So a devise of residue to A and B; the codicil revokes every legacy, thing, and part to A; B, shall take the whole. Humphrey v. Tayleur, Ambler, 136. The reason is plain; each is a taker of the whole, but not solely; for the whole is devised to both, and not a moiety to each. The argument, that the devisee would take a larger interest than was devised to him, does not apply; for the joint-tenants, being seised per my etper tout, the original devise is sufficient to carry the whole interest.
The same reason holds, where one joint-tenant disagrees, disclaims. Lease for life to B., remainder to C. and D., in tail; C. and _D. cannot disagree to the remainder without matter of record; they are tenants in common. But if the remainder had been limited to them in fee, so as they took jointly, it had been otherwise; for then by the disagreement of one, the other shall take the whole land. 4 Leon, 332.
Whether this disagreement is to be by matter of record, was a matter of nice learning. It would seem it was required to be so; at least the party who disagreed in pais was not divested of the freehold: he might disagree to it, and support his right in a Court of Record. But this de *531 pended on the ancient feudal system, its leaving in doubt, who would be a proper tenant to the prmcipe. Butler and Baker’s case, 3 Rep. 26. This remnant of the doctrine of feuds is not applicable to, nor has it been adopted in Pennsylvania. But there it was a case of feoffment to four, and seisin delivered to one, in the name of the four by public investiture. To be sure, an acceptance of a devise will be presumed; but how can there be a disclaimer in a court of record. Here has been a disagreement in pais, and the only opportunity that could be had, is seised hold of, on the trial of this cause by the jury; two joint-tenants Joseph Snyder and Charles Penrose, utterly disclaiming in a court of record. Had they come into Court and agreed to act, it would have presented another question ; the disagreement in pais, being before action brought, and the first opportunity taken to disclaim in a court of record, the subsequent ratification would have relation to the first act.
It cannot be in the power of one joint-tenant to defeat the grant to his companion ; and this would be the case in joint-tenancy, if the refusal by one to accept did not cast the whole on him who agreed to the devise. It does not amount to a severance, but confers the whole right on his companion who then holds solely. Considering the legal estate only, I am of opinion, that the present plaintiff became solely seised, during the continuance of the estate devised, accountable to the beneficial devisees for the rent. Until the time when partition was to be made, the legal title, the right of possession, was vested in Margaret Jones, solely.
The second question respects the mode of authenticating' Irish statutes so as to render them evidence.
The validity of the marriage of the testator with Elizabeth Taylor, was called in question. This depended on the statutes of the Kingdom, the supposed marriage rites having been celebrated there. The validity of every marriage depends on the laws of the country where it takes place. If good there, it is good every where. If void there, it is void every where. The testator and Elizabeth Taylor at the time of its celebration were subjects of the Kingdom. The evidence given, was that of an Irish barrister, conversant with the laws of the country, that he received these printed acts from George Greerson, the King’s printer in Ireland; who delivered them to him as authentic copies of the several acts *532 of. Parliament printed by him and his predecessor in office, by virtue of the King’s patent to them; that these copies would be received in all Courts in Ireland, as authentic documents, and that the printed statute book, or copies of particular acts, printed by the King’s printer, would be received in evidence, without any proof -of their having been compared with the original rolls.
This evidence of the witness was proper. The unwritten law of a foreign country may be proved by professional men, or others Conversant with, and having the means of knowledge. The mode of authenticating the statutes in Ireland, depended not on statutory provision. It was evidence that he received these copies from one authorised exclusively to print them, and that these copies were received in evidence there, and so far was legal evidence. Further than this, this evidence was not received. Foreign laws are to be proved as facts; unwritten laws by witnesses having knowledge of them. Written laws by documents, copies; for the originals never can be resorted to. Usage, the expositor of time, is the best evidence of the law. In transactions in a foreign country, there has been a relaxation of the rigid rules of evidence. The distance, the difficulty of proving foreign laws, is great enough. But if to this, were added the expense of procuring a copy under the State seal, or a sworn copy, it would in many cases, amount to a denial of justice. The fees would in many instances, exceed the value of the matter in controversy. All British statutes, since the charter to William Penn, are, as to Pennsylvania, foreign laws. Yet these statutes from the statute book printed by the King’s printer, have been received in evidence, without challenge of the parties, antecedent to, and since the revolution. I mean public statutes. From what source have the Judges of this Court, on the report of the British statutes adopted in practice in Pennsylvania, drawn information of the existence of the statutes ? From Ruff head's edition. The laws of our sister States have been constantly read in evidence from the printed statute books, without requiring an attestation taken under the act of Congress. The Circuit Court in The United States v. Johns, 4 Dall. 412, received the statute books of Maryland as evidence of a private act of incorporation. In Thompson v. Musser, 1 Dall. 458, in this Court, in a well considered case, the public statutes of the *533 State of Virginia, reported to be printed by the law printer of Virginia, (for there was no evidence of his being the printer,) was held-to be sufficiently authenticated, so as to be at least prima facie evidence. And I agree with the learned Judge who presided in this Court, in the opinion delivered, that there is stronger reason, or reason at least equally cogent, for the admission of such evidence from remote nations. To allow such proof, as they beyond sea will allow of, of acts there, would appear to be the true rule. And evidence of a foreign law promulged in any civilised nation according to their own forms, whether the document be written or printed, I would receive as prima facie evidence of such law, whether a sworn copy, a copy under seal, or a public.law published by authority. Indeed such authorised authentic publication would be more satisfactory evidence, than a sworn copy ; less danger of mistake, or corruption, or fabrication. How then are public acts published in Great Britain and Ireland? We have evidence that they are in this form ; and that in this form without further authentication, they are received in all Courts of justice. The distinction between public and private acts is great. Private acts, affect only particular individuals; most frequently contain grants, privileges, and immunities to an individual. It is his interest and his duty, as they are the muniments of his private rights, to have the' strongest possible evidence of their existence ; evidence from the original source. This is a better reason, than that public general laws are always inpectore judicis, but not so of particular- private bills. This might be true enough if the statutes were but few ; and when it was argued in the case of Basket v. The University of Cambridge, that they were only read to assist the Judge’s memory, Lord Mansfield observed, that this assistance was now become very necessary, for the acts of 29 Geo. II. were as numerous as the whole reign of Elizabeth. 1 W. Bl. 117. Basket v. The University of Cambridge.
Before printing was introduced, temp. Henry VI., the usage was to transcribe all the acts at the end of every sessions, and send them to the sheriffs with a writ commanding them to proclaim them in their county Courts, where the .transcripts were kept for the public to resort to. 4 Inst. 26. This writ ceased in the time of Henry VIII. Since that reign they have been published by the King’s printer, whose published copy *534 is substituted in the room of the transcript sent to the sheriffs. The whole history of the King’s patent to printers, and of the exclusive right to publish the laws; will be found in Basket v. The University of Cambridge, 1 W. Bl. 105. The printed statute book has been received at all times as evidence of public acts of Parliament. Private acts are proved by an examined copy, compared with the original in the Parliament office at Westminster. But to prevent the inconvenience of such strict proof a special clause is now usually inserted, providing that the act should be deemed public, in which ca.se the printed copy, printed by the King’s printer, will be sufficient evidence of its contents. These private acts are not to be found in the printed statute books. So that it is not the being inserted in a statute book which gives them authenticity, but the publication by the King’s printer. But it has been determined, that an act of Parliament not in the statute book, might be given in evidence if printed by the King’s printer. Basket v. The University of Cambridge. The King’s power to appointa printer is not foundedon any act of Parliament; but on the inherent prerogative of the King, to whom it belongs to promulge all laws to the people. For all these reasons, it appears to me, that the evidence was properly admitted. To these considerations, may be added the provision of St at. 41. Geo. III. C. 90. S.9, made for the more effectual proof of the statute law, enacting, that the copies of the statutes of Great Britain and Ireland prior to their union, printed by the printer duly authorised, shall be received as conclusive evidence of the several statutes in the Courts of either Kingdom. Here they are only to be received as prima facie evidence. In the words of Chief Justice M‘Kean, in Thompson v. Musser, to require other proof of the authenticity of these laws would be pregnant with intolerable inconvenience, destructive to trade, commerce, and credit; and in several cases fatal to justice.
It is proper to notice briefly, the objection to the acknowledgment of the deed. It is said, there was evidence that one of the witnesses to the deed was suffered to be present during the examination of Mrs. Maffet, then the wife of Isaac Hozey, and in whom the title was vested. This is true : but our act of assembly requires not a privy examination. It is sufficient if the feme covert be examined separate and apart from her husband. The omission of this word *535 privy, could not have been accidental. The legislature do not use the technical language employed in a separate examination on a fine, but drop this word: whether accidental or designed, it is sufficient to say, that it is omitted. To invalidate the acknowledgment on this ground, would be to disturb very many deeds; for however commendable the practice may be, it is not usual to examine the feme covert privately, and in the absence of all but the magistrate. But the acknowledgment was objected to on the ground, that the evidence was only, that the husband had withdrawn, but that the door of the apartment was left open ;' at least, no proof that it was shut. Every act of an authorised publie officer must be presumed to have been rightly done, solemniter acta. The examination was separate and apart from the husband. There is no evidence, that he was in such state as that he could hear the examination. He had withdrawn; whether he remained in the passage, retired into another room, or into, the street, is not known. If there had been any testimony to fix a collusion between the magistrate and the husband, and the husband permitted designedly to be within hearing, for the purpose of intimidating the wife; this might have affected the acknowledgment. But the reverse of all this was the fact.
Rule discharged.